## Nugent v. Duncan

*Duff & Doyle*, for plaintiff.

*Saul L. Rubin*, for defendant.

CERCONE, J., July 12, 1956.—This matter comes before the court en banc on defendants' petition to open judgment confessed in an amicable action in ejectment, plaintiffs' answer and deposition of the parties.

On October 9, 1944, James A. Nugent, Esq., now deceased, entered into articles of agreement with David Duncan and Mary Duncan, his wife, defendants, wherein Mr. Nugent contracted to sell to defendants a two-story, six room house located at 7110 Church Street, in the Borough of Swissvale, Allegheny County.

The salient terms and conditions of the agreement were as follows: The sales price was $2,400, of which amount defendants were to pay $400 as hand money, and $30 a month, together with interest, until the sum of $1,200 was paid. Upon payment of the $1,200, Mr. Nugent was to deliver a deed to defendants in exchange for a mortgage between the parties for the remaining $1,200, payable at the rate of $30 a month, together with interest. Under the agreement, defendants were obligated to pay the taxes and insurance on the property, and any municipal improvements assessed against it. Upon default of any payment of principal or interest for a period of 60 days, the deceased plaintiff had, as one of his optional rights in case of default, the authority to confess judgment in ejectment and issue a writ of habere facias possessionem with a fi. fa. for costs, etc.

Mr. James A. Nugent died on November 6, 1950, and on October 1, 1951, the coexecutors of his estate confessed judgment in an amicable action in ejectment upon default of defendants to make payments according to the articles of agreement. It was this action of the coexecutors which gave rise to the cause now determined by this court.

In the proceedings in which depositions of the parties were taken, Mr. Duncan testified to oral conversations alleged to have taken place between him and the deceased, which defendants contend modified the articles of agreement and absolved them of any possible default. His daughter, Joan, likewise testified in support of her father concerning these conversations which allegedly were held in her presence. This testimony was objected to by plaintiffs' counsel. The objection was based, of course, upon the well-known prohibitory Evidence Act of May 23, 1887, P. L. 158, excluding the party himself as a witness to prove his claim or defense against decedent's estate or interest.

To this objection defendants contend that by reason of an assignment of the agreement to their daughter, Joan, and her husband, Hugh P. Hagan, they relinquished their interest therein, thus qualifying Mr. Duncan as a fully competent witness under section 6 of the Evidence Act of May 23, 1887, supra.

These two contentions of defendants, namely, that the oral agreement modified the articles of agreement, and that Mr. Duncan and his daughter, Joan, are competent to testify against decedent's interest, comprise the crux of defendant's case.

It is the opinion of this court that the testimony of Mr. Duncan and his daughter, Joan, even if admissible, is nevertheless insufficient to change the character of the original articles of agreement. In arriving at this conclusion, the record has been carefully examined for evidence which might justify defendants' contention that the articles of agreement had been changed by oral modification of said agreement. The record is barren of any such evidence.

According to Mr. Duncan, a year or so after he and his wife moved into the premises, they experienced serious marital difficulties and the wife moved to Florida, where she obtained a divorce on November 7, 1947. She later remarried. Prior to the divorce and up to August 30, 1946, defendants kept up their money obligations under the agreement rather regularly, paying a total of 22 monthly payments. However, after that time the payment program all but collapsed. The testimony clearly showed that the amounts paid thereafter never were sufficient to comply with the contractual obligations. In the year 1946 the amount of $60 was paid. In 1947 the sum of $240 was paid. In 1948 the year after the divorce, nothing was paid. In 1949 $60 was paid, and in 1950 the sum of $200 was paid. No further sum was paid since the last payment mentioned.

Mr. Duncan introduced into evidence a receipt book which he kept of payments he made totaling $1,200 as of June 2, 1947, of which amount the sum of $280.24 was deductible as interest, leaving an amount of $919.27 paid toward the principal of the debts. As of said date, to wit, June 2, 1947, he was in default in payment of a municipal claim in the amount of $809.12, taxes in the amount of $104.27, and insurance premiums in the amount of $15.30. This was the closest Mr. Duncan ever came to paying the $1,200 he agreed to pay before getting the deed. After that the record of payments grew progressively worse until the balance owed and municipal claim was in excess of $3,000.

Mr. Duncan, in his testimony, stated that because of his marital troubles, and further, because of the acquaintanceship, friendship and mutual understanding which existed between him and Mr. Nugent, he and Mr. Nugent, in a series of oral conversations, agreed to modify the articles of agreement to the extent that he, Mr. Duncan, did not have to pay $30 a month, that it was all right if he paid as much as he could, and whenever he could. Mr. Duncan also stated that the deceased plaintiff orally agreed not to pursue his rights to confess judgment if the occasion ever arose.

When his own counsel asked him to be more specific about the conversations he had with Mr. Nugent, defendant, Mr. Duncan, revealed in his testimony a remarkable lack of substance or meaning with regard to his claim of oral modification of the agreement. Typical of his testimony is the following:

"Q. Now can you explain to us your understanding of the agreement between yourself and Mr. Nugent with respect to the modifying of this agreement after June of 1947, just what was your understanding with Mr. Nugent at that time?

"A. Well, the only thing he told me, just to keep paying, that's all, not to worry about that.

"Q. Did he indicate to you in any way that he would continue to carry the account as heretofore.

"A. That's right.

"Q. Did he request you to continue to make your payments as you had been doing it?

"A. Well, he told me different times to get a little over and see if I couldn't pay a little bit on the property."

And again his testimony is a follows:

"Q. Mr. Duncan, can you explain to us, please, under the oral modified agreement between you and Mr. Nugent at that time was there any definite fixed period of time under which you were to pay off the balance that was due or was this to be a running continuous account indefinitely in the future?

"A. That is the way it was.

"Q. Now your answer does not indicate the proper answer, will you explain what you mean by 'that is the way it was'?

"A. What I mean, just keep paying, there was no deadline, wasn't ten, wasn't twenty, wasn't thirty.

"Q. Was it to go on definitely with you making payments until the amount had been paid off?

"A. That's right."

On cross-examination Mr. Duncan admitted that during the lifetime of James A. Nugent, deceased, he received a notice to vacate the premises because of default of payments. One of the letters of notice which Mr. Duncan received was dated December 31, 1949, in which it was stated that of the 62 monthly payments due to December 10, 1949, only 32 had been paid, and that no taxes, insurance or street assessments were paid. The balance at this time, including a bill for $809.12 for an unpaid municipal improvement, was $2,755.30.

The evidence showed that after Mr. Nugent died on November 6, 1950, James H. Nugent, Esq., son of de-

ceased, sent a registered letter on July 11, 1951, to Mr. Duncan, informing him that of the 81 monthly payments due to July 10, 1951, he had made only 32 payments, and that during that time no taxes, insurance or street assessments had been paid, leaving a balance of $2,848.91, not counting 1951 taxes.

James H. Nugent, Esq., son of deceased, testified that he never knew of the assignment until after judgment was confessed, although Mr. and Mrs. Hagan testified they had informed him several weeks before judgment was taken. Mr. Nugent further testified that his father had never spoken to him of any oral modifications of the articles of agreement.

It is the opinion of this court that regardless of the competency or incompetency of the testimony of Mr. Duncan's daughter, Joan, defendants cannot prevail in their claim that any oral modifications of the articles of agreement were established between them and Mr. James A. Nugent, deceased. It is well established that subsequent oral modifications relating to the manner of performance do not change the character of a written contract, even when said oral modifications are clearly and precisely established. In the instant case the testimony and evidence is so palpably weak, nebulous and unsatisfactory that it cannot possibly sustain the contention that an oral modification had taken place: Novice v. Alter, 291 Pa. 64; Frechie v. Boyd, 100 Pa. Superior Ct. 553; Knight v. Gulf Refining Co. 311 Pa. 357.

The existence of an oral contract changing either the manner and mode of performance, or the nature and character of the written contract itself, must be clearly and positively shown. The terms must appear definite from the evidence: Knight v. Gulf Refining Co., 311 Pa. 357.

If the extension of time was to remain forever indefinite from June of 1947, as defendants allege, then

they would be under no obligation to ever pay the money owed. The testimony of defendants concerning extension of time, consideration based on friendship, improvements to the real estate and estoppel, as set forth in the testimony, is too unsatisfactory in nature and character to substantiate defendants' contention of oral modification of the agreement. It is therefore the opinion of this court that defendants have failed to make a case of oral modification of the agreement.

As to whether or not Mr. Duncan and his daughter, Joan, are competent to testify under section 6 of the Evidence Act of May 23, 1887, it is well to consider the testimony in this case.

In the course of his testimony, Mr. Duncan testified that at the time he was having marital problems he talked to the deceased plaintiff about assigning the said agreement to his daughter, Joan, and that the deceased plaintiff said he didn's care what Mr. Duncan did, and that he had no objections if Mr. Duncan wanted to assign the agreement. Mr. Duncan testified that his daughter, Joan, was present when some of these conversations concerning the change in mode and manner of payment in connection with the assignment were held. Defendants' daughter, Joan, who later married and became Mrs. Hagan, corroborated this testimony.

It was not until after the death of Mr. Nugent, and after receipt of notices to vacate the premises, that Mr. Duncan and his former wife, Mary Duncan, now Mary McCune, and Richard I. McCune, her husband, assigned the articles of agreement for the price of $4,000 to the daughter of the Duncans, Joan Hagan, and Hugh P. Hagan, her husband. Mr. Duncan testified that since the assignment he received $200 from his daughter and her husband. However, there is no creditable evidence of this payment. Mrs. Hagan was evasive on questions concerning payment of this sum.

Her husband, Hugh P. Hagan, said that the amount had been paid in cash at the time of execution of the assignment, and Mr. Duncan testified that the money: "Was paid me once in a while—maybe a couple of dollars."

In considering the problem of competency of witnesses under the act, it might be said that the act was intended to prevent the injustice of permitting a surviving party to testify favorably to himself and adversely to decedent, which testimony decedent's representatives are not able to refute. Citing Weaver v. Welsh, 325 Pa. 571.

It is true that an adverse party in such a situation may qualify himself a competent witness if he can prove that in good faith he divested himself of any interest in the cause: Darragh & Co. v. Stevenson, 183 Pa. 397. In this case defendant, David Duncan, claimed competency to testify by reason of the assignment to his daughter, Joan, and her husband, and in such a case it is the duty of the court to decide whether such an assignment was made in good faith and not merely as a device to qualify as a witness. In determining this question, the court must keep in mind that an act of a party which increases his legality must affirmatively have been done with other motive than to evade the law. In the present case, the assignment was made after the death of James A. Nugent, and after notices of default and request to vacate were received by defendants. It was notarized after judgment had been confessed.

Defendants did not release or extinguish their right, but merely assigned it to their daughter and son-in-law at a time when it was clear that eviction proceedings were either instituted or about to be instituted against them. It is hard to resist the conclusion that the real purpose of the assignment against decedent's estate, which the law intends to prohibit, was not to

give complete interest to his daughter and her husband, but to make Mr. Duncan a witness in the case.

Justice Gibbons, in the case of Post v. Avery, 5 W. & S. 509, stated in effect that the rule of competency set forth in the Act of 1887 is technically unobjectionable, but, that however faultless it may be in form, it is proved by experience to be intolerably mischievous in its results. He said: "It is used almost daily to let a plaintiff slip out of the garb of a party to put on that of a witness, in what still is palpably his own cause, by means of an assignment to a child, a convenient friend, or a man of straw, while the defendant is bound hand and foot, and exposed defenceless to the assaults of his testimony; and this, too, with scarce the colour of a pretence that he is not the actual party though devested of the *legal* interest."

It is the opinion of the court, therefore, that the testimony of Mr. Duncan is incompetent under the act. By reason of the assignment to Joan Hagan and her husband, Mrs. Hagan was also rendered an incompetent witness as to anything occurring in the lifetime of the deceased and, therefore, her testimony concerning conversations in the case is also inadmissible for the same reason. The fact that the parties are not competent to testify does not avoid, however, the provisions of the assignment as between them. This court's observations go only to the good faith of the assignment in determining the incompetency of the parties to testify, and does not affect the operation and effect of the assignment as between them.

The book entry in the nature of a receipt book kept by Mr. Duncan was admissible as evidence. Mr. Duncan's explanation of the book is inadmissible, since his oral testimony would be an attempt to explain a fact during the lifetime of decedent.

Defendants' contention that if plaintiffs were to prevail in this case they would be unjustly enriched

is untenable, since it could be stated as well in behalf of plaintiffs that if defendants had not been so greatly in arrears, plaintiffs could have received their money at a much earlier date, and invested it for a much greater profit than they received in the transaction with defendants.

Upon careful consideration of the evidence and briefs of counsel, this court concludes that defendants' contentions under the petition, and their evidence adduced in the depositions, have not been substantiated, and their petition is accordingly dismissed.

*Order*

And now, July 12, 1956, it is ordered that defendants' petition be and the same is hereby dismissed.

Eo die, exception noted to defendants and bill sealed.